SAGERS, PLAINTIFF IN ERROR, v. NUCKOLLS ET AL., DEFENDANTS IN ERROR.

1. MASTER AND SERVANT.

The test of the liability of the master for the acts of his servant in all cases is whether the act was done by his express authority or fairly implied from the nature of the employment and the duties incident to it.

2. SAME.

To make the master liable for any act of fraud or negligence done by his servant, the act must be done in the course of his employment. If he steps out of it to do a wrong, either fraudulently or feloniously, towards another, the master is no more liable than a stranger. It is also imperative that the employment be in the prosecution of a lawful business.

3. SAME.

The relation of master and servant cannot exist in a conspiracy or confederation of individuals to commit crime,—all are principals and are jointly and severally responsible for the consequences of the wrong perpetrated.

4. AUTHORITY, WHEN NOT IMPLIED.

A servant can have no implied authority to do that which it could not
    be lawful under any circumstances for either him or his employer
    to do.

5. SAME.

It is not enough that the act should be for the benefit of the master,
    but it must be in the ordinary course of business in order that an
    authority to do it may be implied.

*Error to the District Court of Garfield County.*

This was an action at law brought under the provisions
of chap. 27, Genl. Stats., by plaintiff in error, widow and
heir at law, to recover damages for the death of her husband,
George W. Sagers, alleged to have been shot and killed by
William E. Nuckolls.   The following are the important al-
legations contained in the amended complaint:

" That on said last mentioned date, and from the month
of October, A. D. 1883, hitherto the above named defendants,
Reef & Nuckolls, as plaintiff is informed and believes, were
and now are copartners in business, and doing business in .
Garfield county, in buying and selling, pasturing, herding,
raising and handling, slaughtering and dealing in cattle, beef
and stock.   That in their cattle and stock business, said de-
fendants, Emmet and G. Harvey Nuckolls took possession
and used and claimed a large tract of the unsurveyed govern-
ment lands, situated upon the east branch of Mann creek,
in said Garfield county, state of Colorado, and which said
tract said defendants occupied and claimed as their head-
quarters, or home ranch,for their said cattle and stock busi-
ness, and occupied and improved the same by and through
their agents and employees and the said G. Harvey Nuckolls,
and pretended to own the same and have the right to sell
and dispose of the same ; but plaintiff alleges that said defend-
ants so claimed and occupied the said public lands, without
a legal right, under or by virtue of the laws of the United
States, or of the states of Colorado so to do.

" Second.—That on the said 7th day of September, and for
a long time prior thereto, to wit : From the month of January,

A. D. 1888, William E. Nuckolls was serving said defendants as an employee, agent or servant, at and upon the said headquarters, aforesaid; that he worked and labored for the said defendants thereon in farming and herding the stock of said defendants, and among the duties and requirements of said William E. Nuckolls, as such servant and employee, and for which he was employed by said defendants, it was his duty by general direction and instruction of said defendants to aid and assist said defendants in holding the possession of their said ranch claim, and guns and pistols were provided thereat by said defendants for that purpose, for the use of said William E. Nuckolls and his co-servants at all times during said occupation and claim of said ranch claim, and especially on, to wit, the 7th day of September, 1888, bore (and since said 7th day of September, and now said co-servants are bearing) said arms for said purpose, to wit, the purpose of defending with force and arms, if necessary, the possession of said claim and property, for said defendants, Emmet and G. Harvey Nuckolls, against all comers and claimants, and particularly against the said George W. Sagers, the the lawful claimant of a portion thereof.

" Third.—That said defendants, by and through their said servant, William E. Nuckolls aforesaid, who was then and there engaged and employed, and armed and directed by said defendants as their servant as aforesaid, to hold and maintain them in their possession of said land, and, while the said George W. Sagers was in the act of peaceably and lawfully proceeding through the same, the said William E. Nuckolls pretended and claimed that said George W. Sagers was committing a trespass upon and interfering with the alleged and pretended rights of said defendants, did, on, to wit, the 7th day of September, A. D. 1888, on the said pretended land claim of said defendants aforesaid, negligently, unlawfully and wrongfully cause the death of him, the said George W. Sagers, being then and there in the peace of the people, by the act of the said William E. Nuckolls, in that said William E. Nuckolls did then and there assault and shoot him, the said .

George W. Sagers, with a pistol, commonly called a revolver, a deadly weapon of the size usually carried as a concealed weapon, giving to said George W. Sagers a mortal wound, of which he then and there died, whereby plaintiff was deprived of the care, maintenance, support and protection of her said husband, George W. Sagers, deceased, to her great damage, to wit, in the sum of five thousand ($5,000) dollars, under the statute in such case made and provided."

To this complaint demurrers were filed by the defendants individually, the only ground of demurrer being that the complaint did not state facts sufficient to constitute a cause of action.  The demurrers were sustained by the court.  The plaintiff elected to stand by her complaint; a writ of error was sued out to the supreme court, and the case transferred by that court to this.

Messrs. BENNETT & BENNETT and Mr. J. E. HAVENS, for plaintiff in error.

Mr. J. W. TAYLOR, for defendant in error.

REED, J., after stating the case, delivered the opinion of the court.

The only question presented is the correctness of the judgment of the court in sustaining the demurrers.  In other words, whether the employer is liable in damages under the statute for the killing of a person by a servant or employee under the circumstances as stated in the complaint.  The provision of the statute upon which the action is based is sec. 2, chap. 27, Genl. Stat., entitled "Damages."—"Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which would have been liable, if death

had not ensued, shall be liable to an action for damages notwithstanding the death of the party injured." An examination of the section of the statute under consideration will show that it provides generally for compensation, "whenever the death of a person shall be caused by a wrongful act, neglect or default of another." The circumstances must be such as to entitle the injured party to damages if death had not ensued, but affording no guide as to the circumstances under which the principal or master shall be held liable, hence, the liability must be determined by the rules and principles of the common law.

In 1880, 43 & 44 Vict., chap. 42, an act entitled "The Employers Liability Act" was passed by the English parliament, which, while more elaborate, explicit and detailed than our statute, legally amounts to the same thing, and in fixing the liability the courts in every instance are compelled to have recourse to the common law adjudications.

The solution of the question presented is one of great difficulty. While the general principles and rules of law controlling in such cases are so clearly stated as to render them almost axiomatic, and each rule is stated many times in different language, the principle and result being the same, the trouble has been, and still is, the application of the rules. The conflicting decisions in applying the principles are so numerous as to produce confusion as soon as an examination is undertaken.

The liability of the master for the wrongful acts of a servant is predicated upon the maxim " *qui facit per alium facit per se,*" and is in direct conflict with the broad and universal doctrine of personal liability for wrongs perpetrated; consequently, in applying it great care is taken in restricting it clearly within legal limits. The great multiplication of corporations, where all acts are necessarily performed by agents or servants, has latterly led to the extension and widening of the application in many cases, in order to afford the requisite protection, and from such necessity courts have gradually

extended the principle to cover cases not formerly supposed to be embraced.

. The complaint in the case is very carefully drawn. In order to apply the law an analysis of the complaint is necessary.

First.—It is alleged that Reef & Nuckolls, a firm composed of J. S. Reef, Emmet Nuckolls and G. Harvey Nuckolls, " were buying and selling, pasturing, herding, raising and handling, slaughtering and dealing in cattle, beef and stock." In the second paragraph it is alleged that " Wm. E. Nuckolls was serving *said defendants* as an employee, agent or servant at and upon the said headquarters, aforesaid; that he worked and labored for *said defendants* thereon in farming and herding the stock of the said defendants." * * *

Second. — Taking up the other branch—it is alleged in the first paragraph, " that in their cattle and stock business, Emmet and C. Harvey Nuckolls took possession of and claimed a large tract of the unsurveyed government lands * * *, which said tract said defendants occupied and claimed as their headquarters, or home ranch for their said cattle and stock business, and occupied and improved the same by and through their agents and employees and the said G. Harvey Nuckolls, and pretended to own the same and have the right to sell and dispose of the same; but plaintiff alleges that said defendants so claimed and occupied the said public lands, without a legal right, under or by virtue of the laws of the United States, or of the state of Colorado." In the third paragraph it is alleged that Wm. E. Nuckolls, who was engaged, employed and armed by defendants " *to hold and maintain them in their possession of said land*," shot and killed Sagers for a pretended trespass upon the land. Though not fully and affirmatively stated, it is fairly inferable, that the trouble and controversy resulting in the killing grew out of the possession of the land, for it is said, in speaking of the land, " George W. Sagers, the then lawful claimant of a portion thereof."

The sufficiency of the complaint, in the first instance, must be tested by the following general principle, controlling in

all cases of this character:—" Was the act done under such
circumstances that under the employment the master can be
said to have *authorized* the act?   For if he did not, either *in
fact* or *in law*, he cannot be made chargeable for its conse-
quences; because not having been done under authority from
him, express or implied, it can in no sense be said to be his
act, and the maxim does not apply."    Wood's Mast. & Serv't,
§ 279.   The test of the liability of the master in all cases is
whether the act was done by his express authority or fairly
implied from the nature of the employment and the duties
incident to it.

See *McManus v. Crickett*, 1 East, 106, which is a leading
case on the question under discussion.   Among the earliest
reported cases is that of *Middleton v. Fowler*, Salk. 282.
Holt, C. J. said, " that no master is chargeable with the acts
of his servant, but when he acts in the execution of the au-
thority given him."

The rule is clearly laid down in 1 Black. Com., 429, 431.
It is said: " The master is answerable for the act of his ser-
vant, if done by his command either expressly given or im-
plied ;" again, "if a servant by his negligence, does any
damage to a stranger, the master shall answer for his neglect;
but the damage must be done while he is actually employed
in his master's service, otherwise, the servant shall answer
for his own misbehavior."

In *Foster v. Essex Bank*, 17 Mass. 479, the court said:—
" It may be inferred from the cases as a general rule, that to
make the master liable for any act of fraud or negligence
done by his servant, the act must be done in the course of
his employment, and that if he steps out of it to do wrong,
either fraudulently or feloniously, towards another, the mas-
ter is no more liable than any stranger."   See *Mech. Bank
v. Bank of Columbia*, 5 Wheat. 326 ; *Ellis v. Turner*, 8 Term
Rep. 533.

In Cooley on Torts, 625, it is said, " That which the supe-
rior has put the inferior in motion to do, must be regarded
as done by the superior himself;" and at page 627, " but the

liability of the master for intentional acts which constitute
legal wrongs, can only arise when that which is done is with-
in the real or apparent scope of the master's business.   It
does not arise when the servant has stepped aside from his
employment to commit a tort which the master neither di-
rected in fact, nor could be supposed, from the nature of his
employment, to have authorized or expected the servant to
do."   See also *Ill. Cent. R. R. Co. v. Downey*, 18 Ill. 258;
*Evansville R. R. Co. v. Baum*, 26 Ind. 70; *Crocker v. New
Lond. etc. Co.*, 24 Conn. 249; *Wright v. Wilcox*, 19 Wend.
(N. Y.) 343; *Richmond Turnpike Co. v. Vanderbilt*, 1 Hill,
480, s. c., 2 N. Y. 479.

The next, and one of the most important distinctions and
considerations is, that to render the master liable the act
must be done in the prosecution of the service of the master.
Any deviation so as to render it the act of the servant, the
responsibility of the master ceases, and the fact of the rela-
tion of master and servant has no bearing.

It is said in *Pickens v. Dricker*, 21 Ohio St. 212:—" The
person for whose acts he is sought to be charged must *at the
time* when the act complained of was done, not only have
been acting for him, but must also have been authorized by
him, either expressly or impliedly, to do the act."   It follows
that there must be an employment—the relation of master
and servant must exist; that the wrong of the servant was
incidental to or in the line of his employment and within the
authority given.   It is also imperative that the employment
be in the prosecution of a lawful business.   In a conspiracy
or confederation of individuals to do criminal acts or acts in
violation of the law, there is, and can be no such relation as
master and servant—all are principals—they are all jointly
and severally responsible for the legal consequences of the
wrong perpetrated.   In cases where the master is attempted
to be held liable for the acts of the servant, it is a well set-
tled rule of law that, where the servant acts in obedience to
an express order given by the master, the master is liable for
all the consequences of the servant's acts, either civilly or

criminally. Wood Mast. & Servt. § 278; *Rex v. Bleasdale*, 2 Car. & Kir. 766; *Rex v. Michael*, 9 Car. & P. 357; *Rex v. Palmer*, 1 New Rep. 97.

The troublesome question in all the cases is not of *express* but *implied* authority, whether the act done was so far inci-dental to the service for which he was employed that it may be supposed to have been done " *in the line of his duty and in the furtherance of the master's business.*"

A carefully considered case involving this question is that of *Phelon v. Stiles*, 43 Conn. 426. See also *Rounds v. Del., etc., R. R. Co.*, 64 N. Y. 129.

A well settled principle of law lying apparently at the very foundation of this action is, " That a servant can have no implied authority to do that which it could not be lawful under any circumstances for either him or his employer to do." Shear. & Red. on Neg., § 61; *Lyons v. Martin*, 8 Adol. & El. 512; *Poulton v. London, etc., Ry. Co.*, L. Rep. 2 Q. B. 534; *Steamboat Co. v. Railway Co.*, 24 Conn. 40; *Church v. Mansfield*, 20 Conn. 284; 2 Hil. on Torts, chap. 40, § 6 *a*.

In recent English decisions of cases decided since statutes 43 & 44 Vict., referred to above, an important test of the lia-bility of the principal seems to be whether he had the au-thority to do the act performed by the servant, and if he had not there could be no authority implied from him to the ser-vant, consequently the principal would not be liable for the act of the servant on the ground of an implied authority; and to render a principal liable for the acts of the servant, in a matter that could not lawfully be done by himself, there can be no implied authority—there must be an express authority.

In *Poulton v. London & S. W. Ry. Co.*, L. R. 2 Q. B. 534 *supra*, Blackburn, J., said: " It is not enough that the act should be for the benefit of the master, but it must be in the or-dinary course of business in order that an authority to do it may be implied." See *Edwards v. London & N. W. Ry. Co.*, L. R. 5 C. P. 445; *Lucas v. Mason*, L. R. 10 Exc. Cases, 251.

See further on points stated above: *Rourke v. White Moss Coll. Co.*, L. R. 1 C. P. Div. 556; s. c., L. R. 2 C. P. Div.

205 ; *Rayner v. Mitchell*, L. R. 2 C. P. Div. 357 ; *Storey v. Ashton*, L. R. 4 Q. B. 476 ; *Allen v. London & S. W. Ry. Co.*, L. R. 6 Q. B. 65 ; *Cobb v. Columbia, etc. C. R. Co.*, Sup. Court of Georgia, Sept., 1892; *Goddard v. Railway Co.*, 57 Me. 202.

The following conclusions are inevitable from the allegations of the complaint :

First. That the business of Reef & Nuckolls as a firm, and of Reef as an individual, was legitimate and lawful.

Second. That William E. Nuckolls as the servant of Reef & Nuckolls in farming and handling stock was employed for legal and legitimate service.

Third. That the land attempted to be held was claimed by Emmet and G. Harvey Nuckolls, and that neither the firm of Reef & Nuckolls nor Reef individually had any connection with it whatever.

Fourth. That the killing grew out of a controversy over the possession of land claimed only by Emmet and G. Harvey Nuckolls, and was in no way connected with the employment of William E. Nuckolls by the firm of Reef & Nuckolls, nor in any way incidental to or growing out of it. This disposes of the case as far as the firm of Reef & Nuckolls, and Reef individually, are concerned. As to them no cause of action, whatever, is shown.

Taking up the other branch of the case, it is alleged that Emmet and G. Harvey Nuckolls took illegal possession of a large tract of unsurveyed government land, a part of which was claimed by the deceased; that they and their servants were armed, and were, by force and arms, maintaining the illegal possession of the land, and that William E., in attempting to maintain such possession for Emmet and G. Harvey Nuckolls, shot and killed Sagers. No hiring of William E. by Emmet and G. Harvey Nuckolls is alleged; no relation of master and servant alleged as existing in the attempted holding of the land. The employment alleged, as before stated, was by Reef and Nuckolls in a lawful business. If any liability of any of the parties can be predicated upon the

supposed relation of master and servant, it must be that of Emmet and G. Harvey Nuckolls, in whose interest the alleged wrongs were perpetrated, in a matter entirely distinct and separate and disconnected with the business of the firm.

Applying the principles of law to the facts and circumstances as stated, it is obvious that Emmet and G. Harvey Nuckolls cannot be held liable for the act of the killing. First, it is indispensable that the relation of master and servant existed in the line of employment in which the trouble arose and the wrong was perpetrated. No employment by the parties for any such business or purpose is alleged. It is only alleged as being incidental to his employment by Reef & Nuckolls in farming and the handling of cattle. Second, as above shown, to render the employer liable the employment must be lawful and the business lawful. The wrong and fraud upon the government and the public by taking illegal possession of a large tract of the public domain, preventing its occupation, settlement and sale by and to those who had legal right to occupy under the laws of congress, and maintaining such possession by force and violence, resulting in the taking of life, cannot be regarded as the prosecution of a lawful business and one in which the relation of master and servant could have existence. Under such circumstances all are principals, confederates, in the prosecution of a criminal enterprise, and all jointly, or each individually, may be held criminally responsible for any wrong perpetrated.

It follows, that guarding and protecting the illegal possession of the land claimed by the individuals as alleged was not an incident of the alleged employment, but a criminal and wrongful act as a confederate or a volunteer, in which the question of master and servant could have no place. It matters not, as stated in the complaint, that it was a duty required by others by virtue of his employment that he was armed by his employers, and even had express orders to eject or kill any person invading the possession.

The remedy for such criminal acts cannot be found in a

civil suit for damages, but must be reached by another branch of the law.

I have carefully examined all the authorities cited, supposed to establish the liability of the supposed principals, but the case under consideration is clearly distinguishable. In each and every of those cases it will be seen that the relation of master and servant existed; that the employment was in legal and legitimate business, and that the wrong complained of grew out of the negligence or wanton and excessive exercise of the authority supposed to have been expressly or impliedly conferred, as pertaining to the lawful employment, or as incidental to it. In every instance where the servant stepped out of the line of his employment for his own purposes or in performing acts for another, it has been held that the liability was personal and the doctrine of " *respondeat superior* " had no application.

The judgment of the district court in sustaining the demurrer must be affirmed.

*Affirmed.*